UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 22-cr-10-RJL |
| AVERY CARTER MACCRACKEN, | |
| Defendant. | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Avery MacCracken to 14 months' incarceration – just below the midpoint of the Guidelines range, as calculated by the United States Probation Office – 3 years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment.

I.      INTRODUCTION

The defendant, Avery MacCracken, a 70-year-old man with a lengthy criminal history, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

At approximately 2:23 p.m., MacCracken advanced to the front of a mob of rioters who were attempting to break through a police line on the West Front of the Capitol. As other rioters assaulted the police around him, MacCracken moved to an area where rioters had already pulled the metal barricades away. With two hands balled into fists, he advanced toward a police officer and raised one fist as if to strike. The officer deflected the attack, but MacCracken grabbed another officer's arm and uniform, tussling briefly with the second officer, before moving past.

As the police lines on the Upper West Plaza caved to the overwhelming numbers of rioters, MacCracken continued to advance toward the Capitol building, threateningly one officer, calling him a "motherfucker" and asking if he wanted to "start something."

MacCracken eventually climbed to the top of the inauguration bleachers, where he joined other rioters who were fighting with police. MacCracken faced the police and refused to leave until he was physically pushed off a platform by the police.

Despite tear gas, flash-bangs, and police efforts to dissipate the crowd, MacCracken participated in the riot on the West Front until approximately 5:00 p.m., when the police finally cleared the area.

As a result of his conduct, MacCracken was charged with six criminal counts and pled guilty to 18 U.S.C. § 231(a)(3) (Interfering with Law Enforcement Officers during a Civil Disorder).

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

The government recommends that the Court sentence MacCracken to 14 months of imprisonment, which is just below the mid-point of the Guidelines' range of 12-18 months.[2] A 14-month sentence reflects the gravity of MacCracken's conduct and his extensive criminal history, but also acknowledges his personal circumstances and admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 44, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     MacCracken's Role in the January 6, 2021 Attack on the Capitol

On January 3, 2021, MacCracken traveled from Montrose, Colorado to Washington D.C., by airplane to protest the results of the 2020 presidential election. On January 6, as Congress met to certify the election results, MacCracken joined the mob on the West Front of the Capitol.

### *The Civil Disorder on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6 possible. These assaults, combined with the mob's overwhelming numbers, allowed the mob to overrun the police defensive line, creating an opening for many of them to enter the Capitol.

---

[2] MacCracken was previously detained for approximately six months in connection with this case. *See* ECF 23.

3

By 12:58 p.m., numerous rioters had pushed through the police defenses at the Peace Circle, crossed the unmanned barrier halfway down the Pennsylvania Walkway, overwhelmed the second manned police barrier, and flooded into the Lower West Plaza, pushing against the barricade there.

Despite the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers faced an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.  At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.   It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately.   This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members

4

of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.



*Exhibit 1: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), beginning to fill the Lower West Plaza (top right), breaching the initial West Plaza barricades (bottom left), and pushing against the bicycle rack barricades set up by the police at 1:39 pm (bottom right)*

### MacCracken's Actions on the Lower West Plaza

At approximately 2:23 p.m. on January 6, MacCracken was part of the mob of rioters in the restricted area on the West Front of the Capitol. Numerous rioters were shouting at the police aggressively, throwing objects, spraying the police with pepper spray, and physically engaging with the police.

At that time, MacCracken made his way to the front of the police line.



*Exhibit 2: Still shot from police body worn camera video, showing MacCracken advancing to the front of the mob. MacCracken is the individual circled in yellow, wearing a blue jacket, red hat, a black face mask and sunglasses.*

At 2:24 p.m., MacCracken took a position in the front of the crowd facing the police line with both hands gripping a bike rack that the police were using as a barrier.



*Exhibit 3: MacCracken at the front of the mob, facing the police.*

MacCracken chanted "U.S.A." as he faced the police on the other side of the line. He said

to a police officer defending the line, "You should be on our side, taking these sons of bitches out."

At approximately 2:26 p.m., as other rioters attacked the police line nearby, MacCracken shifted over several feet to a part of the line where the metal barrier had been removed by other rioters. Rioters nearby yelled, attacked, and threw objects at the police. As other rioters surged forward toward the police line, MacCracken also advanced.



*Exhibit 4: MacCracken moving forward with the mob through a gap in the metal barricades.*

At approximately 2:28 p.m., MacCracken charged at a police officer with both hands balled into fists. MacCracken raised his right fist, as if to punch the police officer.



*Exhibit 5: MacCracken, seen from the perspective of an officer's body worn camera, as he approached the officer with his balled fist raised to strike.*

The police officer attempted to deflect MacCracken's blow, gripping his arm and attempting to redirect him in a different direction.



*Exhibit 6: MacCracken coming at the officer with fist extended, as the officer (wearing red gloves) attempts to deflect the blow*

Seconds later, another officer attempted to push MacCracken back, but MacCracken

8

grabbed that officer's arm.



*Exhibit 7: A second officer (on right) attempts to stop MacCracken from advancing, while MacCracken grabs the officer's arm.*

MacCracken then grabbed the second officer's jacket at the shoulder area and briefly tussled with the officer.



*Exhibit 8: MacCracken grabs the second officer by the jacket around the shoulder (circled in red) as he pushes through the police line.*

### The Police Defensive Line Collapses

At the same time that MacCracken rushed the police line, other rioters were doing the same. After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd.



*Exhibit 9: At 2:29, the police line has collapsed, and many officers were assaulted as they attempted to retreat.*

As other rioters poured into the Upper West Plaza, MacCracken continued to advance. At 2:30, as the police continued to fall back, MacCracken faced an officer again with both hands balled in fists.



*Exhibit 10: MacCracken, seen from an officer's body worn camera, with hands balled into fists.*

As the police line disintegrated, some officers continued to attempt to prevent the rioters

11

from advancing forward. Another rioter, wearing a grey jacket, standing near MacCracken resisted a police officer's effort to move him back, stating to the officer, "I'm standing right here. This is my building. I paid for this building. Don't touch me…you work for us." MacCracken stood next to the rioter with the grey jacket, pointed at the police officer and said threateningly, "He's got backup, motherfucker. You want to start something?"



*Exhibit 11: MacCracken threatening the retreating officer.*

As the police retreated, MacCracken moved with other rioters from the West Plaza deeper into the restricted areas of the Capitol grounds.

### MacCracken Climbs to the Top of the Inauguration Stage

Two hours later, at 4:31 p.m. MacCracken stood near the top of the inauguration bleachers, a temporary structure in front of the Capitol above the West Plaza. Other rioters at this location fought with the police, while MacCracken appeared to film the scene with an electronic device.



*Exhibit 12: Third-party video of MacCracken (circled in yellow), who appears to be filming with an electronic tablet, while police attempt to clear the area of rioters. Other images of MacCracken on January 6 show him with the same tablet.*

Several minutes later, MacCracken stood on top of a platform with other rioters, while police officers attempted to clear them from the area. The rioters physically resisted and fought with the police. MacCracken left this area only after he was physically pushed back by the police.

 

*Exhibit 13: Still shots from third-party video, in which MacCracken stands facing the police until he is pushed off the platform.*



*Figure 14: Video from a different angle, showing MacCracken after he has been pushed back, while the police continue to remove other rioters.*

MacCracken remained on the West Front of the Capitol until at least 5:00 p.m. He walked near the Tunnel, an entrance to the Capitol where some of the most violent attacks against police officers occurred, during a time period when rioters were actively assaulting the police.

14



*Figure 15: Third-party video of MacCracken not far from the Tunnel at approximately 5:00 p.m.*

MacCracken remained within the restricted area on the West Front of the Capitol until nearly the end of the riot.

### *Arrest and Post-Arrest Interview*

On December 11, 2021, MacCracken was arrested in Colorado pursuant to an arrest warrant from the District of Columbia. ECF 5. On December 13, 2021, after being read his *Miranda* rights, MacCracken agreed to be interviewed by the FBI.

 MacCracken initially denied being present in Washington, D.C. on January 6th. He stated the events happened almost a year ago and he had trouble remembering due to his age. MacCracken later acknowledged that he was on the "back side" of the Capitol. He stated he saw people trying to smash a window, and in one case using a ladder to get in.

According to MacCracken, the charges against those who participated in the riot at the Capitol were politically motivated. He said the rioters were "patriots" who were pepper-sprayed, flash-banged, and gassed by the police, but were not violent in return. MacCracken denied assaulting any officers or entering the Capitol.

### III.     THE CHARGES AND PLEA AGREEMENT

On January 12, 2022, a federal grand jury returned an indictment charging MacCracken with seven counts, including one count of Civil Disorder in violation of 18 U.S.C. § 231(a)(3). On October 20, 2023, MacCracken pleaded guilty to Count One, Civil Disorder, pursuant to a plea agreement.

### IV.     STATUTORY PENALTIES

MacCracken now faces sentencing on Civil Disorder in violation of 18 U.S.C. § 231(a)(3). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, he faces up to 5 years of imprisonment; a fine of $250,000; and a term of supervised release of not more than 3 years.

### V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The plea agreement and PSR set the base offense level at 10 pursuant to U.S.S.G. §2A2.4 and include the §2A2.4(b)(1) three-level enhancement because MacCracken's conduct involved physical contact with police officers. PSR ¶¶ 36-37. As described above, during the riot, MacCracken approached police officers with two hands balled into fists, attempted to strike an officer, and grabbed another officer's arm and uniform, as he broke through the police line.

The PSR also includes a two-level reduction pursuant to §3E1.1(a), since MacCracken demonstrated acceptance of responsibility by pleading guilty and through his disclosures made during the investigation.

16

The parties thus agree on the following offense-level calculation:

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 10 |
| U.S.S.G. § 3A1.2(b) | Offense involved physical contact | +3 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -2 |
| | **Total** | **11** |

*See* Plea Agreement at ¶¶ 5(A).

The U.S. Probation Office calculated the defendant's criminal history as category III, which is not disputed.[3] PSR ¶ 64. Accordingly, MacCracken's Guidelines imprisonment range is 12 to 18 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a 14-month term of incarceration, which is just below the midpoint of the Guidelines range.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, MacCracken's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing

---

[3] In the plea agreement signed by MacCracken and the Government, MacCracken's estimated criminal history was calculated as Category I. The plea agreement includes the following language: "Your client acknowledges that after the pre-sentence investigation by the United States Probation Office, a different conclusion regarding your client's criminal convictions and/or criminal history points may be reached and your client's criminal history points may increase or decrease." Plea Agreement, ¶ 5.B.   The Government does not dispute the Probation Office's calculation.

the United States into a Constitutional crisis. During the riot, MacCracken joined a mob that broke through the police defensive line on the West Front of the Capitol; with hands balled into fists, he threatened to strike and officer and tussled with another as he pushed forward into the restricted area. As a result of his actions, along with other members of the mob, the police line crumbled, allowing hundreds of rioters to surge forward and enter the Capitol, forcing the shutdown of Congress. The nature and circumstances of MacCracken's offense was of the utmost seriousness, and fully support the government's recommended sentence of 14 months' imprisonment.

### B.  The History and Characteristics of the Defendant

MacCracken is an intermittently employed 70-year-old man with a lengthy criminal history. According to the PSR, he stands 6 feet, 1 inch tall and weighs 185 pounds. PSR ▯ 99. During his interview with the Probation Department, he declared himself to be "very healthy." PSR ▯ 100.

The defendant's extensive history of arrests and convictions weighs in favor of the recommended period of incarceration. As described in the PSR, the criminal history included 16 convictions, beginning when he was 19 years old and including convictions for drug offences, obstruction of a peace officer, assault, and other offences. PSR ▯▯ 46-63. Of note, in 1996, the defendant was convicted of felony trespassing and received a sentence of three years' incarceration. PSR ▯ 52. In 2004, the defendant was convicted of Marijuana Manufacture and received a sentence of 18 months' incarceration in federal prison. PSR ▯ 57.

In addition to these convictions, and others that resulted in lesser terms of incarceration, the defendant was arrested on 16 other occasions for offences that did not result in convictions.

PSR ⁋ 67-83.

The defendant's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a lifetime history of criminal conduct spanning six decades. The defendant's history and characteristics, including his history of conviction for assault and obstruction, weigh in favor of the recommended term of incarceration.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. MacCracken's criminal conduct on January 6 – obstructing and interfering with law enforcement efforts to control a riot at the Capitol – was the epitome of disrespect for the law.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

19

As reflected in the defendant's criminal history category of III, his six-decade history of arrests and convictions shows a clear pattern of criminal behavior. *See* Section VI(B) *supra.* A substantial term of incarceration is necessary to deter the defendant from committing future crimes, as reflected in the defendant's Guidelines range.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the

need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district

courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to some of the considerations in this case. While each one was convicted of violating Section 231(a)(3), these defendants had lesser criminal histories than MacCracken, resulting in lower Guidelines ranges.

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Moises Romero*, 21-cr-677-TSC, the defendant joined other rioters to push a temporary barrier against officers who were using it to prevent them from entering the Capitol. He grabbed the edge of an officer's riot shield and succeeded in pushing back the police and opening the door. Like MacCracken, Romero pled guilty to violating Section 231(a)(3), and the calculation of his offense level included the 3-level enhancement for physical contact, resulting in a total offense level of 11, after acceptance of responsibility. Unlike MacCracken, however, Romero had a criminal history category of I, resulting an advisory range of 8-14 months. Judge Chutkan sentenced Romero to 12 months and 1 day.

Similarly, in *United States. v. Ronnie Presley*, 21-cr-257-RDM, Presley disregarded police officers' commands to exit the Rotunda and resisted as a police officer used his baton to push him out. Like MacCracken, Presley pled guilty to violating Section 231(a)(3) and received the 3-level increase for physical contact, resulting in a total offense level of 11 after acceptance of responsibility. However, unlike MacCracken, Presley had a criminal history category of II and so faced an advisory range of 10-16 months. Presley was sentenced by Judge Moss to 12 months of incarceration. Given MacCracken's higher Guidelines range of 12-18 months, the Government's recommendation of 14 months would not create an unwarranted disparity.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that MacCracken must pay $2,000 in restitution, which reflects in part the role MacCracken played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of May 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) MacCracken's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 158.

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 14 months' incarceration, 3 years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


By:     */s/ Brian Morgan*
BRIAN MORGAN
Trial Attorney
NY Bar No. 4276804
601 D Street NW
Washington, DC 20530
Brian.morgan@usdoj.gov
(202) 305-3717

25